Good morning, may it please the Court. Jay Segar representing Appellant Daniel Thomas. I'd like to reserve two minutes for rebuttal. The District Court in this case committed legal error by relying on the officer's conclusory statements at the expense of all the facts he actually testified to, and failing to examine the overall reasonableness of the driver's behavior. When all the facts are properly taken in the totality, they do not amount to reasonable suspicion as to each claim violation. The claim of failure to maintain lane exemplifies this pattern of reliance on unreasonable conclusions. The officer testified and the District Court found that the co-defendant Padilla moved over to the fog line and therefore committed the violation of failure to maintain lane. But what the District Court failed to recognize was that the movement over to the fog line was in direct response to Henry coming up so close behind him. He came up to within as close as one car length behind Padilla. He had never seen Padilla on the fog line prior to that time, and it was not until he came up behind him so closely that Padilla moved over to the fog line. What Padilla did was a rational reaction to Henry coming up so close behind, and it was sanctioned by the safe driving advice of the Arizona driver's license manual, which says that if you're being tailgated, if you're being followed too closely, you move over to the right to allow the tailgater to pass. As one District Court judge in Arizona noted, it is one thing for law enforcement to observe a vehicle being driven in violation of traffic laws. It's quite another for law enforcement to create that which it deems suspect. And that's exactly what happened here. Officer Henry himself conceded that he told Agent Mace, who was the ICE agent that took over the case, he told him that the reason he believed Padilla moved to the fog line was to allow him to pass. And that was the only reason for the fog line driving that Mace put into his report. Henry then read through, signed, and approved of that report. And in Sigma Ballesteros and Robert L., both of these cases, the officer came up to a and made a lane change. The officer in those cases considered this to be erratic driving, but the court determined it was perfectly reasonable conduct. How long was he driving on the fog line? The fog line driving was, what I had put in my brief, was 1.1 miles. What happened was the District Court found, and the government conceded in brief, that Officer Henry testified to turning his lights and sirens on at milepost 122 and then the car stopping at 123. This is important because that's in the total time considered for the fog line driving. When you say the District Court, are you referring to the district judge or to the magistrate judge? The district judge, in his order, found that it was about, he used the word about milepost 122 when he turned his lights and siren on, about milepost 123 when the car stopped. This was the general vicinity. And what he clarified on cross, and this is getting a little bit into the failure to yield, but what he clarified on cross was that, and this is at ER 97, in terms of the stop, in terms of the stop, you activated your lights and siren at milepost 122. Yes. And then the vehicle continued on for another 200 yards and then stopped. Yes. And this was about 10 to 15 seconds. Yes. How about before he turned the lights on? Before he turned the lights on, he came up to just past milepost 121 and then he turned his lights on at 122. So that would have been slightly less than one mile before he turned his lights on. Was he on the fog line when he was first seen? No. Or was he moved over when the officer approached? In fact, the District Court found in its order that it was when he approached and came up behind him that he moved over to the fog line. What was the speed limit there? 65. How fast was this guy going? 54. I understood he was going considerably lower. No, Your Honor. It was clear from the record that he was going 54 miles an hour. He was initially estimated, visually estimated, at 50 to 55 when the officer was traveling the opposite direction. And then when he paced him and clocked him, he was at 54. And that was the speed at which Padilla continued to travel. And when Henry came up so close behind him, one point I wanted to make was that in sight of him... Excuse me. Didn't the judge find he was traveling 11 miles below the speed limit? Yes. And that would have been the 54 miles an hour, 54 miles an hour in a 65 zone. Okay. I misheard you. I thought you said it was 55 and he was going 54. If I said 55, Your Honor, I meant to say 65. 65 zone was the limit. 65 was the limit and 54 was the speed. Why isn't that on an open stretch of highway sufficiently of concern to make an inquiry about why he's going so slow on a freeway where people travel faster? Your Honor, I think what's important to note here is that this was not a high volume of pedestrians. I think it was a Friday night, so it was a higher volume of pedestrians was likely. Well, let me rephrase it. The officer said he was going unusually slow for the area. Your Honor, I believe this was an unreasonable standard that the officer was forcing motorists to adhere to because he testified that 65 miles an hour would be a reasonable speed limit. He also testified that most of the time you could be stopped for impeding traffic. And if I could just briefly refer to something here in the record, I think it's important that ER 105 to 106, he was questioned as to the different hazards that were present. And the hazards were darkness, heavy traffic, pedestrians, animals, hitchhikers, curves. Those are all factors that require a person to reduce their speed. Is that correct? Yes. Okay. I guess I'm not making my point clear. If an officer sees somebody going much slower than what you normally see for that area, why isn't that cause to at least investigate what's going on? Maybe the driver's tired, maybe he's drunk, maybe he's whatever, sick? Your Honor, the traffic code, I think the best answer for that is that the traffic code allows for reduced speed when it's reasonable and prudent. I'm not saying he has the right to ticket him or arrest him. I'm saying to make an inquiry, what's going on? Why are you going so slow when everybody else goes fast here? Your Honor, I think the problem with that is that it would catch – it would be too wide of a net to say someone's going 11 miles below the speed limit when there's numerous hazards which the officer himself concedes were present and which would require reduced speed, and the traffic code allows for reduced speed that's reasonable given these hazards. I think you'd just catch too many people. This might be different in circumstances where these hazards are not present, but if the traffic code allows for reasonably slow speed based on these hazards, I think that you'd be – too many people would be subject to that stop, and I don't think that that would be a reasonable basis for pulling someone over. If I could just briefly turn to the plate lamp violation, the alleged plate lamp violation. This was, again, the district court relying on an unreasonable conclusion. The conclusion was Officer Henry testified that he could see the plate lamp was not lit within 50 feet to the rear, but he also testified that his combined rate of speed when he passed Padilla was 109 miles per hour. That's 158 feet per second. That means that within one quarter of one second, he would have needed to make this fog line – I mean this plate lamp view through his fleeting glimpse through his mirror. He had one quarter of one second to do that, and this is even assuming that he could get his window down in time because the district court found that it was when he bypassed Padilla that he rolled his window down. The windows are tinted. They slowly go down. Even assuming he could do that, he'd have to look through his rearview mirror, focus on the area of the plate, and then determine, make a detailed assessment of whether that plate is clearly legible. And it was simply unreasonable, insufficient as a matter of law to rely on that unreasonable conclusion. And I think that the district court clearly erred in even finding that as a fact. I think it's implausible that any person, officer with training or not, can make this fleeting glimpse through the mirror and determine whether it's clearly legible. Not just light, what the amount of light is. He thought the light was out, right? He believed that the light was out, Your Honor. Why couldn't someone fleetingly determine whether a light is on or off? Well, Your Honor, we're talking about one quarter of one second to determine whether he could see that area where the plate is. I understand the argument, but, I mean, what evidence is there that somebody can't immediately determine whether a light is on or off in just a fraction of a second? Well, Your Honor, I think that this Court determining whether it's reasonable or not is within the purview of this Court. I would have no way of knowing, really, whether, you know, how long it would take the brain to perceive whether a light is on or off. Your Honor, I think the point I'm making here is that it's insufficient to rely on as reasonable suspicion. It's insufficient to ask. Well, I think theoretically possible is different from whether something is plausible. Well, that's what I'm saying. What evidence do you have that it's not plausible? Do you have somebody, do you have a, you know, some kind of scientist or an expert to say, you know, the human mind can't perceive a light being on or off?  I think that when we're looking at in terms of what is reasonable, I think that it's not sufficient for reasonable suspicion to believe that the light could be seen to show that it's clearly legible or not. And in point of fact, the light was not properly on the license plate, I guess. Is that right? The light was on, Your Honor. It pushed away from the plate. He said pushed away, and it was when he put his hand under it, he could see it. So there was light coming down onto the lamp. Okay. I see you're out of time. Thank you. Okay. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Assistant to the United States Attorney Anca Pope from the District of Arizona, representing the United States, the employee in this case. Thank you. This Court should uphold the district court's decision to deny the defendant's motion to suppress evidence on the grounds that the arresting officer had reasonable suspicion to stop the defendant's vehicle. The district court conducted a no-violence hearing here. The district court listened to Officer Henry's testimony and evaluated his credibility and then found that his testimony was credible and the district court did not clearly err. To the contrary, all its findings were well grounded in the record here. Similarly, the district court found that the officer had reasonable suspicion to stop the defendant's vehicle and this decision was also well grounded in the record and was not erroneous. The stop here was justified by articulable facts which combined with Officer Henry's training and experience as a police officer and the reasonable inferences he could draw from that training and experience created a reasonable suspicion of a criminal activity and several traffic law violations. What's your take on this, the exchange between your opponent and Judge Silverman about, you know, whether it's physically possible for a person to, you know, open a window, look in the rear view mirror and see something within 50 feet at night within a quarter of a second? Officer Henry testified that as the vehicle approached him, he rolled down his window automatically all the way down to identify the vehicle. He noticed that it was a blue door, a four-door blue sedan and as the vehicle bypassed him, he looked in his side rear view mirror and noticed that the license plate lamp was out and was not visible 50 feet from where we are. Now, Officer Henry was obviously a trained and very experienced police officer who was able to make these observations. It's possible for even a trained person to, you know, look in the rear view mirror and focus on the license plate, you know, within a quarter of a second? Yes, Your Honor. And I agree with Judge Silverman that it doesn't require more than a quarter of a second to determine that a license plate lamp is out. It was dark. He had to see it. Yes. He was already, he's trained to make these observations. He was already looking in his side rear view mirror. He noticed the license plate lamp was out. It doesn't take, if he thought the license plate lamp was out, he may have that belief at 40 feet, 50 feet or 60 feet. It doesn't make much of a difference. Well, it makes a difference because you don't have to see it more than 50 feet. Yes, but he testified that he believed the license plate was out. If it was out, then it wouldn't have been visible. Isn't there evidence that it was not out but it was just displaced? It was his belief that it was out. Then after the stop was conducted, he investigated further and determined that the license plate lamp was on but was very dim and tucked up into the frame. He only could notice that it was lit by putting his hand right under the light and see that it was shining on his hand. And this was a good faith mistake of fact which doesn't affect the reasonableness of the stop. Well, it wouldn't be a mistake of fact if he's accurate because then it would be on but inadequately lit. That's correct. The mistake of fact was about being out completely instead of not adequately illuminating 50 feet from the rear. What do you make of the point Mr. Segar made about it was the officer who basically forced this guy to drive on the shoulder of the road on the fog line? There's nothing in the record. There's no evidence to support that claim. The defendant or no one testified about it. Officer Henry conceded that that could have been one of the explanations for the driver's driving on the fog line. However, he also testified that given his training and experience, the manner in which he was driving on the fog line and slow could have indicated that he was driving under influence or was fatigued or many other reasons. He was not required to rule out innocent conduct here before conducting a stop. All I understood what Mr. Segar said is that the officer testified he sped up and basically that's what caused the guy to go over on the line. Is that not correct? This is what he testified, but there is no basis in the record for that claim. The testimony was that he was not. The officer didn't testify to that. The officer testified that he believed one of the reasons why he would have moved on the fog line is to allow him to pass. But another reason was that he could have been impaired or fatigued. So he considered there are multiple explanations for this conduct, but he had a reasonable suspicion that he could have been impaired, and he decided to conduct a stop. I want to be unconfused. If a driver reacts to something in a legal way, with all whatever training somebody wants to have, how can that be suspicious when that's the only thing that a driver would be expected to do? How can that be suspicious? With regard to moving on the fog line? Yes. If that is a permissible, in fact, recommended procedure, then how can somebody say that's suspicious? Well, Officer Henry testified that this vehicle was already driving slow. He noticed the speed was way below the reasonable speed limit in that area. Then he starts falling behind him. He moves on the fog line and onto this one-foot wide shoulder, which he testified was dangerous given the high potential for pedestrian traffic on that shoulder. He drove on the fog line for two miles, which again he testified is unusual for someone to drive two miles onto the shoulder to allow someone else to pass on this narrow lane. It's unreasonable to do what's recommended because of the hazards of pedestrians, but it's not reasonable to drive 11 miles an hour slower than the speed limit because of the concern for pedestrians. Well, the difference between those two is that driving below the speed limit, and again, Officer Henry is very familiar with the area. He patrolled that area for six years almost every day and testified that drivers there, despite the potential hazards, drive at the speed limit or above because the road is straight. There were no curves between milepost 121 and 123 where he got stopped. The visibility was clear. There was no wind. And also driving into the driving lane as opposed to on the shoulder where actually pedestrian would be walking is reasonable to maintain the speed limit that was found reasonable by the local authorities. With regard to – then again, there was also the violation regarding a failure to yield immediately when Officer Henry turned on his lights and siren. And here the defendants drove for almost a mile before stopping, which is unreasonable. They bypassed a large clearing half a mile after Officer Henry turned on his emergency equipment and bypassed another opening and finally came to a stop a mile later. So that was another traffic law violation. And Officer Henry properly stopped his vehicle and the district court did not err. Thank you, Ms. Powell. Mr. Zagar, you used up all your time. Did you want to take 30 seconds or you don't have to if you don't want to? Your Honor, if I could just take 30 seconds, that would be great. The failure to yield, just to briefly touch on that one, the clarification, the direct was about 122 to 123. The clarification on cross was 10 to 15 seconds, 200 yards. And it was reasonable for him to pull over in that short distance. And we have to remember that this road, there was brush, there was cacti along the side of the road. It was dark. He had a car behind him. Officer Henry maintained the distance of as little as one car length behind him. If he were to make an abrupt maneuver, that would possibly result in a crash. He had to follow the duty of reasonable care under the traffic code, and he did that. Thank you. Thank you. Ms. Powell, thank you. The case just argued is submitted. Good morning.
judges: Garbis, Tashima, Silverman